E. B. STEPHENSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CHARLES A. McCLOUD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

W. M. LEONARD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JENNIE FAULKNER AND B. J. FAULKNER, EXECUTORS, ESTATE OF ALBERT O. FAULKNER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 6195, 7357, 12684, 22744, 20405. Promulgated September 10, 1928.

*T. S. Allen, Esq.,* for the petitioners.
*L. A. Luce, Esq.,* for the respondent.

318

OPINION.

LANSDON: The single issue presented by this appeal is whether or not the petitioners sustained losses deductible from their incomes during the taxable years claimed. Considering first the issues common to all, the basis of the losses claimed is the contributions made by petitioners to the joint fund placed in the hands of the trustee for the purpose of purchasing the objectionable paper from the bank. The statutory authority for the deductions claimed is section 214(a) of the Revenue Acts of 1918 and 1921, which are identical in terms and provide as follows:

That in computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in trade or business;

(5) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *

In support of their appeal petitioners urge several theories, viz, first, that the venture was incidental to their regular business as bankers and that the losses therefore were incurred in trade or business and deductible under subparagraph (a)(4) of section 214; second, that if not regular business losses, they were losses incurred in a transaction entered into for profit and allowable as deductions under subparagraph (a)(5) of said section; and, third, if neither of the first or second class, their losses were incurred through expenditures made in discharge of moral obligations under circumstances which bring them within the rule announced by the Board in *Herschel V. Jones*, 1 B. T. A. 1226.

The first contention is untenable. Petitioners were only engaged in the banking business by and through a legally chartered bank with which they were connected. When petitioners lifted this paper out and placed it in a private pool, the transaction became an individual venture.

The second contention of petitioners is likewise unsound and fails to find support in the evidence. Practically the only fact well proven in this case, out of the great mass of testimony, is that which reveals the distressed condition of the bank in the fall of 1920 and during 1921. There can be no question as to the good faith of these directors in their laudable efforts to save this bank; laboring as they were in the dark, without knowledge as to the real conditions and pledging their private fortunes to this one end. But this does not change the character of their acts; it only emphasizes more forcibly the motive which prompted them—the goad, in other words, which stimulated their activity. In December, 1920, a substantial loss was foreseen by the directors. They claim that it was their belief at that time that it would not exceed $75,000, but Howey and Dunn knew otherwise and it must be assumed that the directors feared the worst since the pledges they secured from Howey and Dunn at this time were for losses up to $300,000, which was followed by loans made secretly by the directors to the bank in the sum of $195,000. The bank examiner also was taking an active interest in the affairs of this bank during this period and early in January told Maly, the newly elected vice president, that the bank was in bad shape and that he had better get in there and help straighten things out. There were also strong hints from him to the effect that the bank might be closed unless its assets were put in a more liquid condition; and it is inconceivable that these directors were unmindful of this grave situation when on April 22d the board met and passed a resolution which called upon the directors to execute notes or pay in cash the additional sum of $200,000 to take

out all slow or doubtful paper. It was following this, on the same day, that the meeting was held in Stephenson's office, when McCloud suggested that perhaps the best way to get rid of the examiner would be to make a big hole in this stuff and "take it out of the bank." It was here that the pool was agreed upon and there is no evidence that the question of profits was discussed. The possibility of loss, however, was mentioned and directors Maly, Barkley, and Carlsen demurred joining until the return of their contributions was guaranteed. There is some evidence to the effect that these contributing directors believed that a substantial profit would be derived by them from a liquidation of the pool assets, but it is far from convincing; and such belief, if seriously considered, does not seem to have entered into the initial discussions at the time of forming the pool or to have formed any part of the motive which prompted the contributors. In fact, no specific paper or list of papers was considered for purchase by these directors when they met on April 22d and signed the pledges for contributions to the pool. All this was to be left to the judgment of the trustee, who would accept such paper as the committee might thereafter select for withdrawal from the bank. So, in the very nature of things, such speculations were out of place. It is clear, therefore, that whatever hopes there might have been for profits out of the pool assets must have been inspired after their selection, segregation and delivery to the trustee subsequent to the pledges and payment of the contributions by its members.

Aside from the considerations of investment and expected profits, the petitioners have not met the requirements as to proof of loss as required under the statute. Much time was consumed at the hearing and voluminous testimony introduced through depositions to show the efforts made to realize upon the assets of the pool, but the great bulk of this evidence was based upon reports, not put in evidence, made by traveling agents sent out by the bank to trace assets, and such was so nebulous in form and unsatisfactory as to details as to be of little or no value in this proceeding. On the other hand, there is no evidence of any kind to show that the petitioners in any way sought to avail themselves of their remedy against the bank which sold them these securities. The resolution adopted by the board of directors of the bank on May 15, 1921, which authorized this sale, provided that the notes and receivables so sold should "bear the endorsement of the said City National Bank," and also provided further "that the officers of the City National Bank * * * are hereby empowered to place in the hands of a trustee agreed upon to represent the directors, additional notes and receivables as collateral to the endorsement of this bank on notes sold to said directors * * *."

It is obvious, therefore, that the petitioners had recourse against the bank for any losses they might sustain through their purchase

of these accounts, and, in the absence of proof of the insolvency of the bank, or other reasons why it can not be so held, no proof of ultimate loss has been established.

As to the last claim made by petitioners, which it is unnecessary to decide in view of our holding of the failure of petitioners in their proof of loss, it might be well to say that, in our view of the facts here, they are not such as to bring them within the rule laid down in *Herschel V. Jones, supra.* In that case the deduction claimed was the amount paid in liquidation of a loss actually sustained by a partner in business with the taxpayer. It was a *bona fide* business loss which the taxpayer, for certain business reasons, saw fit to assume and in acknowledgment thereof had given his note. The note, of course, imputed consideration and could only be defeated by repudiation on the part of the taxpayer. For moral considerations, the taxpayer chose to pay the note and take the whole of the partnership loss as his own. Moral considerations and their duties to the stockholders of the bank, as well as to the community, may have played a part in causing these directors to take the steps they did, but in the case at bar it was to prevent a loss to the bank, and not to make good a prior loss, which prompted them to act. Howey and Dunn did voluntarily assume losses, but petitioners took steps to protect themselves and at all times felt that they were moving within a margin of safety.

In denying the deductions claimed by petitioner McCloud, growing out of the loan to M. C. Snyder & Sons, respondent treated the obligation created by the original loan as a closed transaction as and from the time of the adjudication in bankruptcy. He considered the insurance policy as the property of petitioner from said date and reckoned its cost to him by taking its surrender value of $1,200 on March 1, 1913, and adding thereto the sum of $300 thereafter paid in premiums, making a total cost of $1,500 to petitioner. By this process he determined a net gain of $500 to petitioner on the settlement of $2,000 made in 1923. The basic error of the respondent lies in his treating the title of the insurance policy as having vested in the petitioner at the time of the bankruptcy proceeding. Such a result never did obtain. The policy was delivered to the petitioner at the time of the making of the loan as a pledge to insure the payment of said loan, and its character as such was left unchanged by the bankruptcy proceedings. McCloud had received a dividend of $1,125 from the receiver upon his claim and the debtor requested that he protect the policy against lapse by payment of the premiums until such time as the same would have a cash surrender value. This offer, when accepted by McCloud, amounted to a new contract, based upon

a valuable consideration, which revived the original debt to the extent of the unpaid balance, and left the pledged security still the property of the debtor subject to the additional claims of McCloud for premiums thereafter paid. Further evidence of this understanding appears from the subsequent acts of the parties. Following this arrangement, McCloud paid nine premium installments upon this policy, which carried it up to the time when it had a cash surrender value, after which Snyder himself resumed the payments and so continued until the compromise settlement in 1923.

The rule in *Henry D. Kline*, 3 B. T. A. 1138, cited by respondent, has no application to the facts in this case. There the policy dealt with was that of the taxpayer himself, who had bought and paid for it in full prior to March 1, 1913, at which time it had a fixed surrender value. Here the policy was on the life of another who at all times owned the equity and who was paying the premiums at the time he redeemed it from petitioner. Petitioner at no time owned this policy, but held it merely to secure the payment of his debt and in case of maturity by death of the insured, would have been held accountable to the insured's estate or beneficiaries for any surplus over his just claim. His loss was the unpaid balance of his loan at the time of the bankruptcy as increased by the premiums paid by him to protect the policy, less the sum paid in compromise of the debt.

*Decision will be entered under Rule 50.*